UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
EDMOND GRANT P/K/A "EDDY GRANT,"
GREENHEART MUSIC LIMITED (UK), and
GREENHEART MUSIC LIMITED (Antigua & Barbuda),

              Plaintiffs,

  -against-

DONALD J. TRUMP and DONALD J. TRUMP FOR
PRESIDENT, INC.,

             Defendants.
------------------------------------------------------------------------x

Civil Action No.
1:20-cv-07103-JGK

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(b)(6)

Plaintiffs respectfully submit this Memorandum of Law in Opposition to Defendants' Supplemental Memorandum of Law in Support of Their Motion to Dismiss (ECF #46), dated September 8, 2021. After briefing on Defendants' motion had been completed, this Court directed the parties to submit supplemental briefing to address the impact of the Second Circuit's decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 2021 WL 3742835 (2d Cir. Aug. 24, 2021)("*Warhol II*"), which reversed the decision of this Court in 382 F. Supp. 3d 312 (S.D.N.Y. 2019)("*Warhol I*"), a case upon which Defendants here relied heavily in their initial motion papers.

In those papers, Defendants insisted to this Court that "*Andy Warhol* [*I*] is directly on point. It is, again, telling, that plaintiffs do not even mention, much less attempt to distinguish, *Andy Warhol*." Defendants' Reply Memorandum (ECF#27 at

1

5). Defendants believed *Warhol I* to be so central to their argument, in fact, so "directly on point," so incapable of being meaningfully distinguished, that it was the principal authority they cited for all four of the fair use factors in that Memorandum. Under the market-harm factor, 17 U.S.C. § 107(4), *Warhol I* was the *only* authority Defendants cited. *Id.* at 7.

Following the reversal of *Warhol I* in *Warhol II*, Defendants have changed their tune. They now concede, as they must, that in *Warhol II* "all four fair use factors favor [plaintiff] and that the [defendants' works] are not fair use as a matter of law." Defendants' Supplemental Mem. (ECF #46 at 2). But somehow, rather than seeing *Warhol* as being "directly on point," as they did only a few months ago, Defendants now ask this Court to believe that "there are significant *factual distinctions* between Warhol II and the present case." *Id.* (emphasis added). Defendants do not attempt to explain how, on appeal, with no new factual record, the *same set of facts* in the *same case* has gone from being "directly on point" to being significantly distinguishable, as if that were even possible. In truth, this Court must recognize that the facts of *Warhol* have now been held to favor copyright owners, so Defendants have no use for them and conveniently deem them distinguishable. The facts have not changed.

Defendants also assert that "nothing in *Warhol II* changes the fair use analysis in this case or affects' Defendants' position" that their use is fair as a matter of law. *Id.* This is flatly incorrect: the *Warhol II* decision destroys the fair use argument Defendants have been making to this Court. To summarize, Defendants' principal argument is that because their Animation "adds something new" to the Plaintiffs' Composition, with a "new aesthetic," "new expression" or "different character," it is

2

by definition transformative and therefore fair use. *Warhol II* directly refutes that argument.

The Second Circuit in *Warhol II* holds at *7, for example, that "many derivative works that 'add something new' to their source material would *not* qualify as fair use" (emphasis original). Even though alteration of the original work is the *sine qua non* of transformativeness, "it does not follow, however, that *any* secondary work that adds a new aesthetic or new expression to its source material is necessarily transformative." *Id.* at *6 (emphasis added). In short, the *Warhol II* court made clear that notwithstanding *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013), there is no "bright-line" rule of the sort Defendants here try to foist on this Court, to the effect that "any secondary work is *necessarily* transformative as a matter of law if looking at the works side-by-side, the secondary work has a different character, a new expression, or employs new aesthetics with distinct creative and communicative results." *Warhol II* at *6 (emphasis original).

Without such a bright-line rule, Defendants fail to provide any support whatsoever for dismissal of this action, let alone under Rule 12(b)(6). All they offer is a repetitive recounting of the ways their Animation allegedly has a "new character" vis-à-vis the Composition. But as noted above, *Warhol II* states explicitly that identifying some such "new character," while it may be necessary, is not sufficient to establish fair use. For example, Defendants state in ***bold italics*** (ECF#46 at 3) that the Composition is for musical entertainment and the Animation is for political commentary, as if that difference in purpose were sufficient to establish fair use, but the Second Circuit has long recognized that a mere "difference in purpose is not quite

3

the same thing as transformation." *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998)(finding no transformative use, and no fair use, despite different purpose of defendant's use).  And as the cases cited in Plaintiffs' initial Memorandum of Law uniformly recognize, the unauthorized use of a popular song in a video to promote a political candidate (or denigrate a candidate's opponent) is not transformative, *Browne v. McCain,* 612 F. Supp. 2d 1129 (C.D. Cal. 2009), and is not fair use, *Henley v. DeVore,* 733 F. Supp. 2d 1144 (C.D. Cal. 2010).

      Since the facts of this case are so drastically dissimilar from those in any of the authorities Defendants rely on, such as *Cariou,* they cannot win this motion to dismiss unless those cases establish a broad, bright-line rule of law. The Second Circuit in *Warhol II* holds explicitly that there is no bright-line rule, *see Warhol II* at *6 ("fair use is a context-sensitive inquiry that does not lend itself to simple bright-line rules"). And *Warhol II* holds further that any attempt to find such a rule in *Cariou* "stretches the [*Cariou*] decision too far." *Id.*  Viewing fair use as a context-sensitive inquiry, as *Warhol II* instructs, it is clear that the only cases that support Defendants' position are miles apart factually, and the cases that are factually identical, like *Henley* and *Browne*, involving the use of songs in promotional videos for political candidates, favor Plaintiffs. Therefore, the Defendants' motion to dismiss must be denied.

      *Warhol II* also supports Plaintiffs' argument that the Defendants' use here is commercial, quoting the Supreme Court's reasoning in *Harper & Row v. Nation Enters.*, 471 U.S. 539, 562 (1985) that the "crux of the profit/nonprofit distinction is whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." *Warhol II* at *11.  Here, the customary price for

using a popular song in the soundtrack of a promotional video is factual issue that has yet to be determined through discovery, but as *Henley* recognizes, it is not zero.

Regarding the third fair use factor, the amount and substantiality of the portion used, *Warhol II* reasons (at *13) that the extent of the unauthorized use in that case was not reasonable "in relation to [Warhol's] purpose" because Warhol offered no explanation why plaintiff Lynn Goldsmith's photograph of the musician Prince, rather than any other Prince photo, was necessary to his artistic aims:

> While Warhol presumably required a photograph of Prince to create the Prince Series, AWF proffers no reason why he required *Goldsmith*'s photograph. *See TCA Television*, 839 F.3d at 181-82, 185 (wholesale borrowing of copyrighted comedy routine not reasonable where "defendants offer[ed] no persuasive justification" for its use).

(Emphasis original).

Defendants here have likewise offered no explanation, no justification, for choosing Plaintiffs' Composition to serve as the soundtrack of a video that they readily admit is "unrelated to the original." Def. Mem. (ECF#19 at 8). The amount of the copying, as in *Warhol II,* cannot be deemed reasonable in relation to Defendants' purpose.

With respect to the fourth fair use factor, which looks to actual or potential market harm, *Warhol II* accepted this Court's conclusion, after discovery, that the parties' respective works "occupy distinct markets, at least as far as direct sales are concerned," *id.* at *14, but nonetheless found the fourth factor weighed in the copyright owner's favor. First, it recognized that the burden of establishing a *lack* of market harm rests with the alleged infringer:

> Fair use is an affirmative defense; as such, the ultimate burden of proving that the secondary use does not compete in the relevant market is appropriately borne by the party asserting the defense: the secondary user. *See Campbell*, 510 U.S. at 590, 114 S.Ct. 1164 ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets."); *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998) ("As always, [the secondary user] bears the burden of showing that his use does not" usurp the market for the primary work); *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020) ("Not much about the fair use doctrine lends itself to absolute statements, but the Supreme Court and our circuit have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use.")

*Warhol II* at *15.

Defendants here have come forward with no evidence whatsoever with regard to market harm, or any other fair use consideration; statements of counsel in briefs are not evidence, and Plaintiffs are not required to negate possible affirmative defenses in the drafting of a Complaint. Accordingly, the lack of evidence itself precludes dismissal at this stage, as the Supreme Court reasoned in *Campbell* when it remanded for further development of the record even after finding the defendant's use to be transformative. Particularly in circumstances such as these, this Court should adhere to the holdings of the Southern District and the Second Circuit that deem fair use to be a "highly unlikely" ground on which to grant a motion to dismiss, *Graham v. Prince,* 265 F. Supp. 3d 366, 376 (S.D.N.Y. 2017), and that courts should therefore be "cautious" about doing so. *Wright v. Warner Books,* 953 F.2d 731 (2d Cir. 1991). Certainly after *Warhol II*, the facts of this case do not so clearly favor fair use that a departure from such caution is warranted.

Ignoring this Court's order regarding the scope of supplemental briefing, Defendants' Supplemental Memorandum also addresses *Brown v. Netflix*, *Inc.*, 462 F.

6

Supp. 3d 453 (S.D.N.Y. 2020), *aff'd* 855 F. Appx. 61 (2d Cir. 2021) ("*Netflix*") on the pretext that the Second Circuit's recent summary affirmance on May 18, 2021 supports Defendants' argument.  It does not.

Defendants assert (ECF#46 at 4) that *Netflix* "is far more analogous" to this case than is *Warhol,* but these are the same Defendants who claimed *Warhol* to be "directly on point" before disavowing it. In fact, *Netflix* is completely inapposite here because it does not involve music used as a soundtrack to a promotional video, but turns entirely on the fact that defendants' film was a documentary that captured a burlesque performance in which eight seconds of plaintiff's song was included in a bawdy parody, and carefully placed that performance in a context concerning the revival of burlesque.  The Second Circuit's affirmance, like the Southern District opinion, dwelt on the self-evident documentary character of the film, almost to the exclusion of all other considerations:

> Here, the *documentary character of the Film* fits within those uses identified by § 107: The Film provides a commentary on the burlesque art form and its resurgence in Portland, Oregon, as well as an exploration of the artistic process of the group of dancers on whom the Film centers. The Film does not merely re-broadcast the performances; rather, it combines those performances with cultural commentary on "topics such as gender, sexuality, and the artistic process." [Citation omitted.] Indeed, it is only after interviewing one of the dancers about her views on such matters that the Film then shows a part of that dancer's performance wherein she attempts to express these views. It is while *documenting this performance* that the Film incidentally captures this dancer's use of the Song as brief background accompaniment to her burlesque act. In this context, Defendants' incidental use of the Song is *consistent with the Film's nature as a documentary providing commentary and criticism.*

855 F. Appx. at 62-63 (emphasis added).

Rejecting plaintiff's contention that the Film was not a documentary, the Court observed, "the Film has all the hallmarks of a documentary film, including interviews, commentary interspersed with footage of events, and a narrative voiceover. Further, Plaintiffs did not allege in their Complaint that the Film is anything but a documentary." *Id.* In other words, whether the defendants' film was a documentary was a contested and apparently all-but-dispositive issue in the case. Documentaries have a long history of being deemed fair use, even when they incorporate music as part of their criticism and commentary. *See, e.g., Lennon v. Premise Media Corp.,* 556 F. Supp. 2d 310 (S.D.N.Y. 2008)(use of 15-second clip from John Lennon song "Imagine" in documentary about religious controversy in academia held fair use). Defendants' video here is not a documentary, it is an advertisement.

Further, the filmmaker in *Netflix,* in the course of documenting burlesque performers, merely captured a performance in which a small fragment of the plaintiff's song – eight seconds – was included as part of the dancer's own expression of views about gender and sexuality. Here the use is more than five times as extensive, occupies a vastly greater amount of Defendants' work, and is utterly "unrelated" to the rest of Defendants' video, by their own admission.

Finally, the use of the song by the performer in *Netflix* was a classic parody, as defined in and exemplified by the lewd rap song in *Campbell*, because it ridiculed an innocent song by placing it in a bawdy, sexualized context. Defendants have repeatedly conceded that their video is not parody but rather "satire" (ECF #19 at 1), and *Campbell* explicitly recognizes that satire is less transformative, and less likely to qualify as fair use. *See Campbell*, 510 U.S. at 580-581, "[p]arody needs to mimic an

original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing." Here, unlike the filmmakers in *Netflix,* Defendants have offered no justification for using plaintiffs' Composition, rather than any other composition, as the musical underscore for their promotional video. Defendants' Supplemental Memorandum (ECF #46 at 6) offhandedly equates "documentary purposes" and "purposes of political satire," but *Campbell* and *Netflix* refute any such alleged equivalence. Therefore, the affirmance of *Netflix* does nothing to support Defendants' motion to dismiss.

Moreover, whether the second work is in the form of a documentary, a "political satire" or anything else, the Second Circuit has held that

> the focus of inquiry is not simply on the new work, i.e., on whether *that* work serves a purpose or conveys an overall expression, meaning, or message different from the copyrighted material it appropriates. Rather, the critical inquiry is whether the new work uses the *copyrighted material itself* for a purpose, or imbues *it* with a character, different from that for which it was created. [Citation omitted]. Otherwise, any play that needed a character to sing a song, tell a joke, or recite a poem could use unaltered copyrighted material with impunity, so long as the purpose or message *of the play* was different from that of the appropriated material.

*TCA Television Corp. v. McCullom*, 839 F.3d 168, 180 (2d Cir. 2016)(emphasis added).

Defendants' entire argument here – the video is fair use because it's political satire about Joe Biden and the Composition isn't – is exactly what the Second Circuit identified in *TCA Television* as the "flawed" reasoning of the district court in that case, which involved the use of a famous comedy routine, "Who's On First?," in defendant's otherwise unrelated play:

> This reasoning is flawed in that what it identifies are the general artistic and critical purpose and character of *the Play*. The district court did not explain how defendants' extensive copying of a famous comedy routine was necessary to this purpose, much less how the character of the *Routine* was transformed by defendants' use.

Id. at 179 (emphasis original).

In sum, *TCA Television* concluded that

> even if the Play's purpose and character are completely different from the vaudevillian humor originally animating Who's on First?, that, by itself, does not demonstrate that defendants' use of the Routine in the Play was transformative of the original work.

*Id.* at 180.

Defendants here ask this Court to adopt this same flawed reasoning. This court should instead follow the Second Circuit in *TCA Television* and find that Defendants' unnecessary and unexplained use of the Composition is not transformative.

For the above reasons, and those set forth in Plaintiffs' prior submissions in this case, the Court should deny Defendants' motion to dismiss and set a schedule for discovery and further proceedings.

                Respectfully submitted,

Dated: September 22, 2021
   New York, New York     */s/* Brian D. Caplan
                Brian D. Caplan
                bcaplan@reitlerlaw.com
                Robert W. Clarida
                rclarida@reitlerlaw.com
                REITLER KAILAS & ROSENBLATT LLP
                885 Third Avenue
                New York New York 10022
                (212) 209-3050