UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EDMOND GRANT P/K/A "EDDY GRANT," ET
AL.,

                          Plaintiffs,                20-cv-7103 (JGK)

          – against –                                OPINION AND ORDER

DONALD J. TRUMP, ET AL.,

                          Defendants.

---

JOHN G. KOELTL, District Judge:

The plaintiffs, Eddy Grant; Greenheart Music Limited, a United Kingdom Company ("Greenheart UK"); and Greenheart Music Limited, an Antigua and Barbuda Limited Company ("Greenheart Antigua") (collectively, "Grant" or "the plaintiffs") brought this copyright infringement action against former President Donald J. Trump and Donald J. Trump For President, Inc. ("the Campaign") (collectively, "the defendants") for the unauthorized use of Grant's music in an animated video. The video was created by a third party during the 2020 presidential election campaign and was posted by former President Trump on his personal Twitter account.

The defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, the motion to dismiss is **denied**.

1

I.

The following factual allegations are based on the
Complaint, and are accepted as true for purposes of this motion
to dismiss. Grant is a musician, songwriter, and the sole owner
of Greenheart UK and Greenheart Antigua. Compl. ¶¶ 10, 19. The
song at issue in this case is "Electric Avenue," which was
written, recorded, and produced by Grant. Compl. ¶ 20. Electric
Avenue was originally released in 1983. Compl. ¶ 25. The song
spent five weeks at number two on Billboard Magazine's Top 100
Chart, and was certified platinum by the Recording Industry
Association of America. Id.

Grant assigned all of his rights and interests in the
musical composition and sound recording that comprise Electric
Avenue to Greenheart Antigua in or about 1983. Compl. ¶ 13.
Greenheart UK is an affiliated company and licensing agent of
Greenheart Antigua with respect to Grant's musical works,
including Electric Avenue. Compl. ¶ 14. The plaintiffs
collectively are the beneficial owners of the performing arts
copyright in the composition, and Greenheart UK is the
beneficial owner of the sound recording copyright in the
recording. Compl. ¶¶ 22-23, 31. Grant alleges that both
copyrights are valid and subsisting. Compl. ¶¶ 24, 33.

On August 12, 2020, at or about 9:35 p.m., former President
Trump published a Tweet from his personal Twitter account

2

containing a fifty-five-second animated video. Compl. ¶ 35. The
video endorsed former President Trump's 2020 presidential
reelection campaign and sought to denigrate the Democratic
Party's 2020 presidential nominee, now-President Joseph R.
Biden. Compl. ¶¶ 36-37. The video begins with a depiction of a
high-speed red train bearing the words "Trump Pence KAG [Keep
America Great] 2020." Compl. ¶ 38; Ex. 2 to Saunders Decl. (copy
of the video). After the red train passes, the beginning of
Electric Avenue can be heard clearly, along with an excerpt of a
speech by President Biden. Around the same time, a slow-moving
handcar, operated by an animated likeness of President Biden,
comes into view bearing the words "Biden President: Your Hair
Smells Terrific." Id. The video—in particular the contrast
between the trains and the unflattering nature of the excerpted
language from President Biden—appears intended to criticize
President Biden and depict the strength of former President
Trump's campaign. Grant's song can be heard beginning at around
the fifteen-second mark of the video, and continues through the
duration of the fifty-five second video. Compl. ¶ 39.

Grant alleges that the Campaign provided former President
Trump with the animated video or otherwise contributed to the
creation, production, and distribution of the video. Compl. ¶
41. As of September 1, 2020, the video had been viewed more than
13.7 million times; the Tweet containing the video had been

"liked" more than 350,000 times, re-Tweeted more than 139,000 times, and had received nearly 50,000 comments. Compl. ¶¶ 43-44.

The defendants did not receive a license or Grant's permission to use the song in connection with the animated video. Compl. ¶ 46. In fact, one day after the Tweet was published, Grant advised the defendants by letter about the defendants' perceived unauthorized use of Grant's copyrights, and demanded that the defendants cease and desist from further infringing conduct. Compl. Ex. C.

The Court has reviewed the video at issue and listened to the copyrighted song. These materials can be considered in deciding the defendants' motion to dismiss because the plaintiffs' Complaint incorporates them by reference, and because the plaintiffs rely upon the contents of the video and song in bringing this copyright infringement action. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010) ("In copyright infringement actions, the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings.").[1]

---

[1] Unless otherwise noted, this Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

II.

In deciding a motion to dismiss pursuant to Rule 12(b)(6),
the allegations in the complaint are accepted as true, and all
reasonable inferences must be drawn in the plaintiff's favor.
See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d
Cir. 2007). The court's function on a motion to dismiss is "not
to weigh the evidence that might be presented at a trial but
merely to determine whether the complaint itself is legally
sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.
1985). The court should not dismiss the complaint if the
plaintiff's complaint includes "enough facts to state a claim to
relief that is plausible on its face." Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 570 (2007). "A claim has facial
plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009).

The defendants argue that the animated video's use of
Electric Avenue was a fair use. Under the Copyright Act of 1976,
fair use is a complete defense to a claim of copyright
infringement. See 17 U.S.C. § 107. "The fair-use doctrine seeks
to strike a balance between an artist's intellectual property
rights to the fruits of her own creative labor, including the
right to license and develop (or refrain from licensing or

5

developing) derivative works based on that creative labor, and 'the ability of other authors, artists, and the rest of us to express them- or ourselves by reference to the works of others.'" Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith, No. 19-2420-cv, 2021 WL 3742835, at *4 (2d Cir. Aug. 24, 2021) (quoting Blanch v. Koons, 467 F.3d 244, 250 (2d Cir. 2006)).

The Copyright Act provides a non-exhaustive list of four factors that courts are to consider in making a fair use determination:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. "[F]air use presents a holistic, context-sensitive inquiry 'not to be simplified with bright-line rules. All four statutory factors are to be explored, and the results weighed together, in light of the purposes of copyright.'" Andy Warhol Found., 2021 WL 3742835, at *5 (quoting Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577-78 (1994)).

Fair use presents a mixed question of law and fact, and because fair use is an affirmative defense, the defendants bear the ultimate burden of proving that the fair use factors balance in their favor. See id. at *4, *15. Because fair use is a fact-

intensive inquiry, it is rarely appropriate for a court to make a determination of fair use at the motion to dismiss stage. See Graham v. Prince, 265 F. Supp. 3d 366, 377, 379 (S.D.N.Y. 2017) ("[I]t is conceivable—albeit highly unlikely—that a fair use affirmative defense can be addressed on a motion to dismiss[.]" (citing TCA Television Corp. v. McCollum, 839 F.3d 168, 178 (2d Cir. 2016))).

## III.

A. Purpose and Character of the Use

The first fair use factor asks the extent to which the secondary work is "transformative" and whether it is commercial. See Andy Warhol Found., 2021 WL 3742835, at *5. To determine if the secondary work is transformative, the court asks "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Id. (quoting Campbell, 510 U.S. at 579). This inquiry requires the court to examine how the secondary work may "reasonably be perceived." Id. (quoting Cariou v. Prince, 714 F.3d 694, 707 (2d Cir. 2013)). The paradigmatic examples of transformative use enumerated in the Copyright Act involve secondary works that comment on the original work: namely, "criticism, comment, news reporting, teaching ...., scholarship, or research." 17 U.S.C. § 107. However, a secondary

work does not need to comment on the original work in order to qualify as fair use. Andy Warhol Found., 2021 WL 3742835, at *6.

The defendants argue that the video's use of Electric Avenue was transformative as a matter of law because the video and the song serve different purposes. But the defendants' argument misapprehends the focus of the transformative use inquiry. While it is true that the animation is partisan political commentary and the song apparently is not, the inquiry does not focus exclusively on the character of the animation; rather, it focuses on the character of the animation's use of Grant's song. As the Second Circuit Court of Appeals recently stated: "where a secondary work does not obviously comment on or relate back to the original or use the original for a purpose other than that for which it was created, the bare assertion of a 'higher or different artistic use[]' is insufficient to render a work transformative." Id. at *8 (quoting Rogers v. Koons, 960 F.2d 301, 310 (2d Cir. 1992)). In this case, the video's overarching political purpose does not automatically render its use of any non-political work transformative. See, e.g., Henley v. DeVore, 733 F. Supp. 2d 1144, 1164 (C.D. Cal. 2010) (rejecting fair use defense at the summary judgment stage where creators of political campaign ads rewrote some of the lyrics but appropriated the melody, rhyme scheme, and syntax of two Don Henley songs without permission); Browne v. McCain, 612 F. Supp.

2d 1125, 1129-31 (C.D. Cal. 2009) (rejecting fair use defense at the motion to dismiss stage where a political campaign ad featured a Jackson Browne song without permission, even though other audio was played on top of the song).

As to the character of the video's use of Electric Avenue, it is best described as a wholesale copying of music to accompany a political campaign ad. As compared to the uses in Henley, the use here does far less—if anything—to modify the song or to comment on the song or its author. In Henley, the defendants changed some of the lyrics to the copyrighted songs and even provided their own vocals. See 733 F. Supp. 2d at 1148-49. And because the defendants there used the songs as vehicles for their political messaging, in one instance to poke fun at Henley himself for his political affiliations, the court found that the secondary works were satire and parody, respectively. See id. at 1152, 1163-64. Nonetheless, the court found that the uses were not transformative because they appropriated too much of the songs in relation to any legitimate parodic purpose. Id. at 1163-64.

In this case, the video's creator did not edit the song's lyrics, vocals, or instrumentals at all, and the song is immediately recognizable when it begins playing around the fifteen-second mark of the video, notwithstanding that audio of President Biden's speech can be heard simultaneously. Moreover,

the animation does not use Electric Avenue as a vehicle to deliver its satirical message, and it makes no effort to poke fun at the song or Grant. As the Supreme Court has stated:

> If . . . the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish) . . . . Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's . . . imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing.

Campbell, 510 U.S. at 580-81. The defendants concede that the video here is clearly satire, not a parody of Electric Avenue or Grant, and the defendants have offered no justification for their extensive borrowing. The fact that the video on the whole constitutes political messaging—just as the advertisements did in Henley—does not, by itself, support a finding of transformative use.

This is also far from the situation in Cariou, where most of the copyrighted works that the Second Circuit Court of Appeals found to have been fairly used were "obscured and altered to the point that [they were] barely recognizable." 714 F.3d at 710. The works in Cariou that were found potentially infringing at the summary judgment stage, on the other hand, "superimposed other elements that did not obscure the original [work,] and . . . the original [work] remained . . . a major if

not dominant component of the impression created by the allegedly infringing work." Andy Warhol Found., 2021 WL 3742835, at *8 (citing Cariou, 714 F.3d at 710-11). And most recently, in Andy Warhol Found., the Second Circuit Court of Appeals concluded that there was no fair use because the secondary work "retain[ed] the essential elements of the [original work] without significantly adding to or altering those elements." Id. at *10.

The same is true here. Electric Avenue is not edited at all and is "instantly recognizable," id. at *13; the additional audio of President Biden's speech does nothing to obscure the song; and the song—which plays for over two-thirds of the duration of the video—is a major component of the impression created by the animation, even though it appears that the video's creator could have chosen nearly any other music to serve the same entertaining purpose. Cf. Kienitz v. Sconnie Nation LLC, 766 F.3d 756, 759 (7th Cir. 2014) ("There's no good reason why defendants should be allowed to appropriate someone else's copyrighted efforts as the starting point in their lampoon, when so many noncopyrighted alternatives . . . were available. The fair-use privilege under § 107 is not designed to protect lazy appropriators."). Accordingly, the defendants cannot show that the video's use of Electric Avenue was transformative as a matter of law.

The defendants rely heavily on Brown v. Netflix, Inc., 462
F. Supp. 3d 453 (S.D.N.Y. 2020), aff'd, 855 F. App'x 61 (2d Cir.
2021), which found a documentary's unauthorized use of a song to
be transformative and fair, but that case is readily
distinguishable. The song at issue there (of which only eight
seconds could be heard in the documentary) was used as part of
the film's "commentary on the burlesque art form and its
resurgence in Portland, Oregon." 855 F. App'x at 63. The court
of appeals noted that the film "[did] not merely re-broadcast
the [burlesque] performances; rather, it combine[d] those
performances with cultural commentary on topics such as gender,
sexuality, and the artistic process." Id. While documenting one
such performance, the film "incidentally capture[d] [a] dancer's
use of the Song as brief background accompaniment to her
burlesque act." Id. The use here is different in magnitude and
kind: the song plays for more than two-thirds of the animation
and plays no discernible role in communicating the video's
overarching political commentary. In Brown, by contrast, the
excerpt of the song was situated within a performance about
which the documentary was commenting, and the song could be
heard only briefly and in passing. Moreover, the content of the
song substantively contributed to the burlesque act. See 462 F.
Supp. 3d at 458. The video here does not comment on the song or
depend on its content to communicate its message. Therefore

12

Brown does not help the defendants establish that the use here was transformative.

The first fair use factor also asks whether the secondary work is commercial. The defendants argue that political uses are by definition not commercial, but that is not so. "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 562 (1985). "Monetary gain is not the sole criterion," especially in settings where "profit is ill-measured in dollars." Weissmann v. Freeman, 868 F.2d 1313, 1324 (2d Cir. 1989).

In Henley, the court held that the defendants' political campaign videos were commercial in nature. 733 F. Supp. 2d at 1159. The court stated that the defendants "stood to gain publicity and campaign donations from their use of Henley's music." Id. Thus the court concluded that the defendants "'profited' from their use by gaining an advantage without having to pay customary licensing fees to the Plaintiffs." Id. The court also noted that the defendants had paid licensing fees for the video footage used in one of the works at issue. Id. at 1159 n.12. It is impossible to gauge the financial implications of the defendants' use of the copyrighted materials on a motion

13

to dismiss, but the possibility of commercial advantage cannot be excluded at this point, especially in light of the instruction from the Second Circuit Court of Appeals that "the profit/non-profit distinction is context specific, not dollar dominated." Weissmann, 868 F.2d at 1324; see also Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1117-18 (9th Cir. 2000) (citing Weissmann and concluding that one church's appropriation of another's copyrighted religious text constituted a commercial use because the infringing church gained an advantage "without having to account to the copyright holder").

The defendants cite to MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc., No. 00-cv-6068, 2004 WL 434404, at *7-9 (S.D.N.Y. Mar. 8, 2004), where the court held that a political advertisement's parody of a popular MasterCard commercial was a noncommercial use. The Nader court found persuasive the reasoning of another district court case from Ohio, where a political campaign's use of the famous "AFLAC Duck" commercial was found to be noncommercial because the candidate used the original work "as part of his communicative message, in the context of expressing political speech." Id. at *8 (quoting American Family Life Ins. Co. v. Hagan, 266 F. Supp. 2d 682, 700 (N.D. Ohio 2002)).

The same cannot be said of the use of Electric Avenue here. Nothing about the song was integral to the video's political message, which is conveyed by the animation and the unflattering excerpts of President Biden's speech. Indeed, the defendants explicitly disclaim any overlap between the purposes of the song and the video. See, e.g., ECF No. 19, at 10. Thus the video does not rely on the song to express its political message; rather, the video incorporates music—like many videos do—to make the video more entertaining and memorable. In no sense does the video parody the copyrighted song or use the song for purposes of commentary. Cf. Nader, 2004 WL 434404, at *12-13. Moreover, there is a well-established market for music licensing, but the defendants sought to gain an advantage by using Grant's popular song without paying Grant the customary licensing fee. Accordingly, the video's use of Electric Avenue appears to be commercial, notwithstanding the video's political purpose. At the very least, the defendants have failed to show that the use was noncommercial as a matter of law.

Because the use was not transformative and appears at this stage to have been commercial, the first fair use factor favors the plaintiffs.

B. Nature of the Copyrighted Work

The second fair use factor "directs courts to consider the nature of the copyrighted work, including (1) whether it is

'expressive or creative or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower.'" Andy Warhol Found., 2021 WL 3742835, at *11 (quoting Blanch, 467 F.3d at 256).

As to the first consideration, it is clear that Electric Avenue is a creative work and therefore is "closer to the core of intended copyright protection." Campbell, 510 U.S. at 586; see also Henley, 733 F. Supp. 2d at 1160. As to the second consideration, there is no dispute that Electric Avenue is published and publicly available. And while a finding that the original work is unpublished cuts against fair use, "the converse is not necessarily true"—"the fact that a work is published does not mean that the scope of fair use is per se broader." Dr. Seuss Enters., L.P. v. ComicMix LLC, 983 F.3d 443, 456 (9th Cir. 2020) (quoting 4 William F. Patry, Patry on Copyright § 10:139.30 (2020)), cert. denied, 2021 WL 2519166 (2021).

Accordingly, because the first consideration of this factor cuts in favor of the plaintiffs and the second consideration is neutral, the nature of the song favors the plaintiffs. However, this factor is assigned limited weight in the overall fair use determination. See, e.g., Authors Guild v. Google, Inc., 804

F.3d 202, 220 (2d Cir. 2015) ("The second factor has rarely played a significant role in the determination of a fair use dispute.").

C. Amount and Substantiality of the Use

The third fair use factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). "In assessing this factor, [the court] consider[s] not only the quantity of the materials used but also their quality and importance in relation to the original work." Andy Warhol Found., 2021 WL 3742835, at *12. All of these considerations favor the plaintiffs. The introductory portion of the song that is used in the animation is immediately recognizable. The excerpted portion of the song also includes the chorus, which repeats six times during the song, comprises the majority of the song's lyrics, and is of central importance to the original work. Moreover, while the excerpted forty seconds of the song make up only 17.5% of the song's total length, the song plays for 72.7% of the animation's duration. "The ultimate question under this factor is whether 'the quantity and value of the materials used are reasonable in relation to the purpose of the copying.'" Id. (quoting Campbell, 510 U.S. at 586). That is plainly not the case here. The song plays for the majority of the animation; the excerpt is of central importance to the original work; and the

17

defendants have not articulated any purpose for the copying. Accordingly, this factor favors Grant.

D. Effect of the Use on the Market for the Original

The fourth and final fair use factor asks "whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work. Analysis of this factor requires [the court] to balance the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." Id. at *14. The defendants correctly note that this factor asks "not whether the second work would damage the market for the first (by, for example, devaluing it through parody or criticism), but whether it usurps the market for the first by offering a competing substitute." Id. However, and critically here, "[t]his analysis embraces both the primary market for the work and any derivative markets that exist or that its author might reasonably license others to develop, regardless of whether the particular author claiming infringement has elected to develop such markets." Id. (citing Salinger v. Colting, 607 F.3d 68, 74, 83 (2d Cir. 2010)).

Of course, the animation here will not serve as a satisfactory substitute for the song itself. However, the video's use may threaten Grant's licensing markets; the issue is whether "unrestricted and widespread conduct of the sort engaged

in by [the defendants]" would substantially harm this potential market. Id. (quoting Campbell, 510 U.S. at 590). It is plain that widespread, uncompensated use of Grant's music in promotional videos—political or otherwise—would embolden would-be infringers and undermine Grant's ability to obtain compensation in exchange for licensing his music.

The defendants do not seriously dispute this. Rather, they argue that Grant has failed to offer evidence that he has entered, or intends to enter, the market for licensing music to promotional videos. But Grant bears no such burden, particularly in response to a motion to dismiss. The plaintiffs have satisfied any initial burden of identifying the relevant market—licensing for promotional videos—as a market that the defendants' copying would harm. See id. at *15 & n.11; ECF No. 24, at 21-23. It is the defendants who bear the ultimate burden of showing a lack of market harm, and they cannot do so based simply on the allegations in the Complaint. Cf. Andy Warhol Found., 2021 WL 3742835, at *15; Henley, 733 F. Supp. 2d at 1162-63.

The fourth factor also "take[s] into account the public benefits the copying will likely produce." Google LLC v. Oracle Am., Inc., 141 S. Ct. 1183, 1206 (2021). Certainly political speech, and in particular "[t]he act of ridiculing and lampooning public figures[,] is a rich part of our First

Amendment tradition[.]" Henley, 733 F. Supp. 2d at 1154.
However, denying the defendants' fair use defense in this case—
especially at this early stage in the litigation—will not chill
legitimate political satire. Creators of satirical videos like
the one at issue here must simply conform any use of copyrighted
music with copyright law by, for example: paying for a license;
obtaining the copyright owner's permission; or "transforming"
the chosen song by altering it with "new expression, meaning, or
message," Campbell, 510 U.S. at 579. The creator of the video
here did none of that.

**IV.**

The Court has applied the foregoing fair use factors in
light of the purposes of copyright, see Andy Warhol Found., 2021
WL 3742835, at *5, and finds that each factor favors the
plaintiffs at this stage. There is some inherent tension between
the promotion of valuable political satire and the copyright
protections of the existing art that satirists may wish to use
as source material. But the copyright law "merely insist[s]
that, just as artists must pay for their paint, canvas, neon
tubes, marble, film, or digital cameras, if they choose to
incorporate the existing copyrighted expression of other artists
in ways that draw their purpose and character from that work . .
., they must pay for that material as well." Id. at *17. The
same principle applies to political satirists.

The creator of the video here made a wholesale copy of a substantial portion of Grant's music in order to make the animation more entertaining. The video did not parody the music or transform it in any way. The video's overarching political purpose does not automatically make this use transformative, and the other fair use factors also favor the plaintiffs at this stage. Accordingly, the defendants have failed to demonstrate fair use as a matter of law. The defendants may reassert their fair use defense at the summary judgment stage when there is a more developed factual record.

## CONCLUSION

The defendants' motion to dismiss the Complaint is **denied.** The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit.

The Clerk is directed to close Docket No. 18.

**SO ORDERED.**

Dated:   New York, New York
         September 28, 2021

                              John G. Koeltl
                     United States District Judge

21