L9RsGRAc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   EDMOND GRANT, personally known as Eddy Grant, et al.,

4                   Plaintiffs,

5             v.                            20 Civ. 7103 (JGK)

6   DONALD J. TRUMP, et al.,

7                   Defendants.

8   ------------------------------x
                                       New York, N.Y.
9                                      September 28, 2021
                                       2:30 p.m.
10
    Before:
11
                         HON. JOHN G. KOELTL,
12
                                       District Judge
13
                             APPEARANCES
14
    REITLER KAILAS & ROSENBLATT, LLC
15        Attorneys for Plaintiffs
    BY:  ROBERT W. CLARIDA
16        BRIAN D. CAPLAN

17

18  PEROFF SAUNDERS P.C
          Attorneys for Defendants
19  BY:  DARREN W. SAUNDERS
          -and-
20  MUKASEY FRENCHMAN LLP
          Attorneys for Defendants
21  BY:  KENNETH A. CARUSO

22

23

24

25

L9RsGRAc

1          (Case called)

2          THE COURT:  All right.  Grant v. trump, 20 CV 7103.

3          Parties, tell us who they are, first for the

4     plaintiff.

5          MR. CAPLAN:  Brian Caplan and Robert Clarida on behalf

6     of the plaintiffs.

7          THE COURT:  Good afternoon.

8          MR. CAPLAN:  Good afternoon, your Honor.

9          THE COURT:  On behalf of the defendants.

10         MR. SAUNDERS:  Good afternoon, your Honor.  Ken Caruso

11    and I'm Darren Saunders.

12         THE COURT:  I should point out that I know Mr. Caruso

13    from years ago.  Nothing about that affects anything I do in

14    the case.

15         This is a motion to dismiss.  I will listen to

16    argument.  I'm familiar with the papers.  Please keep your

17    voices up so that the court reporter can get everything down.

18         All right.  Defense counsel.

19         MR. SAUNDERS:  Your Honor, is it OK if I use the

20    podium or speak from here?

21         THE COURT:  It may be better if you use the podium.

22    Make sure to speak into the microphone.  If the reporter has

23    any difficulty hearing, the reporter will let you know.

24         MR. SAUNDERS:  OK.  Thank you.

25         I understand that we need to keep our masks on, right?

L9RsGRAc

1          THE COURT:  Right.

2          MR. SAUNDERS:  I'll do my best to speak up and be

3    clear.  Thank you, your Honor.

4          On this motion to dismiss, I would like to first begin

5    very briefly with the background.  I understand that the court

6    is familiar with the facts and the case law.

7          THE COURT:  I have watched the video, I've listened to

8    the music, and I'm familiar with the papers.

9          MR. SAUNDERS:  Excellent.  Thank you, your Honor.  I

10   understand.

11         So by way of background, the subject animation was

12   created by a third party unknown to the defendants.  That's

13   just background.  It was unsolicited and it was posted on

14   Twitter and then reposted by President Trump once on his

15   Twitter account.  It has long since been removed and never used

16   again by the defendants.

17         Now, a brief one minute --

18         THE COURT:  None of that really factors into the

19   decision, does it?

20         The motion to dismiss is based on fair use.  It's not

21   based on innocent user or something like that.  it's whether

22   the use was "fair use," not based on a First Amendment defense

23   that there was a First Amendment right to use this in the same

24   way that, in some other cases, there is a right to First

25   Amendment right to use information that's taken.  If you come

L9RsGRAc

1  across the information lawfully, the only issue before me on

2  this motion is was this use fair use.

3          MR. SAUNDERS:  Absolutely correct, your Honor.

4          I only pointed that out because I believe it touches

5  on the fourth factor, the potential harm to the market for the

6  original copyrighted work.

7          We can move on.  I'm just pointing that out.

8          THE COURT:  How can I describe those issues on a

9  motion to dismiss rather than a motion for summary judgment.

10          What's the commercial harm?

11          We don't really know because the details of the market

12  haven't been justifiably explored simply on the basis of the

13  complaint.

14          So could the plaintiff, for example, have had a

15  profitable use of the song by licensing it to other people,

16  perhaps other people who wanted to use it for commercial ads?

17  It was a widely used song, widely played song, recognizable

18  tune, catchy tune.  We don't know any of that.  We don't know

19  the market.  We don't know how much the plaintiff could have

20  made by licensing it either to the defendants or to other

21  people.  We don't know how the use by the defendants affected

22  that market, very, very similar to the photograph in Warhol,

23  and that was on a motion for summary judgment.

24          MR. SAUNDERS:  Understood, your Honor.

25          But I do think there is some significant differences

L9RsGRAc

 1    here, and I agree with what the court has just said with

 2    respect to what we don't know.  But certainly, as in Netflix,

 3    for example, as a recent example of the fair use defense

 4    decided on a motion to dismiss based only on the pleadings and

 5    a side-by-side comparison of the works.  But here, the question

 6    is:  Is it plausible that this one-time -- and that's why I

 7    mentioned a one-time Instagram post -- Twitter post -- is it

 8    plausible that a song that's been around for decades has really

 9    damaged or affected the market for the song, whether it is the

10    primary market to sell it or the secondary market to license

11    it.

12            And I think I would suggest -- this is much later, I'm

13    certainly happy to address it now -- it is clear, and the

14    Second Circuit has emphasized that in assessing market harm

15    under the fourth factor of fair use, the question is not

16    whether the second work would damage the market for the first,

17    such as, for example, devaluing it through parody or criticism.

18    The Second Circuit has said that it's not the question.  But

19    the question is whether it actually usurps the market for the

20    first by offering a competing substitute.

21            So the point of the motion to dismiss here is that on

22    the pleadings, we believe the court can take a look, and is it

23    plausible that the animation, that the snippet of the song in

24    the animation obscured by President Biden's voice, and

25    otherwise could really be considered as an actual competing

L9RsGRAc

1    alternative to the song.

2          THE COURT:  But, correct me if I'm wrong, didn't the

3    Second Circuit in <u>Warhol</u> analyze the factor by asking whether

4    it undercut the possible market for licensing the photograph in

5    that case?

6          In this case, the market would be to license the song

7    to others.  So another political campaign who wanted to use a

8    catchy tune would think they could just take this tune and not

9    pay the licensing fee for it.

10         MR. SAUNDERS:  Certainly, your Honor.  Understood.

11         But I would like to point out a fundamental

12   distinction that I believe is significant between the <u>Warhol</u>

13   case and the present case at bar.  In the <u>Warhol</u> case, it was

14   clear, first of all, that both parties' works were works of

15   visual art.  They were illustrations of the same person, and

16   that they had the same, the Second Circuit found, the same

17   overlapping customer base.

18         I think it is an important decision because here, we

19   don't have that at all.  Here, you know, we have a song that is

20   musical entertainment, that's been around a long time.  And we

21   have an animation that used a very short portion of that song

22   in, really, what was a criticism and satire of President Biden.

23   And in <u>Warhol</u>, if I might suggest, I think it was very

24   plausible, in my view from the Second Circuit opinion, that one

25   might look at -- when a potential customer might truly choose

L9RsGRAc

1    the Warhol instead of the Goldsmith.  I mean, that is very

2    plausible, I think that is what the Second Circuit found,

3    because they were both visual works of art of the same person.

4         But here, what you have is very different factually,

5    your Honor.  Here, what you have is a complete song, and on the

6    other side, you have an animated video with 17.5 percent of the

7    song and then obscured.  So in Warhol, I think a very important

8    distinction, the works really competed with each other.  I

9    mean, they had the same potential audience and they were

10   both -- because they were both works of visual art, one could

11   say, yeah, I would like to buy the Warhol instead of the

12   Goldsmith photo.  But, again, here, you don't really have that

13   distinction at all.  It's very different.

14        THE COURT:  I'm not sure that that was right in

15   Warhol.  I didn't think the markets for the primary work, the

16   photograph versus the Warhol, were the same market.  I thought

17   that the court analyzed essentially the licensing of the

18   Goldsmith photo for its use in a different work of art, the

19   Warhol piece.

20        MR. SAUNDERS:  Right.

21        THE COURT:  It's not clear that the purchasers of the

22   Goldsmith photo were the same market as the purchasers of the

23   Warhol.  It's the licensing which is the issue here.

24        But let me ask you another question.  I would have

25   thought that if you take the Goldsmith photo and transform it,

L9RsGRAc

1    if you will, as Warhol did, and that was not transformative

2    according to the Court of Appeals.  It's sort of hard for me to

3    see how, if you take a song and use the music and the lyrics of

4    the song and you don't change them at all, you just list them.

5    You don't take all of them.  You take 17 percent of them to

6    occupy a large portion of your video, but you just take them

7    and you don't "transform" them in any way.  You just take them

8    and use them, how that use then could be described as

9    transformative.

10         It's conceivably not parody.  It's simply use for

11    purposes of satirizing someone else.  But how can you describe

12    that use as transformative?  You didn't transform it in any

13    way.  You simply listed it and used it.  That seems very

14    different from any sort of transformative use.  It is not use

15    for purposes of parody or commentary or criticism of the work

16    itself.  It is simply listing it without transforming it and

17    without paying for it.  It's like the language from Warhol,

18    that if you're going to use something, it's just like paint,

19    you've got to pay for it.

20         MR. SAUNDERS:  So several points on that, your Honor.

21    I understand the question.

22         First, as a preliminary matter, of course, parody or

23    commentary is not a requirement to find transformative use.

24    I'll just put that out there.

25         THE COURT:  Right.

L9RsGRAc

1          MR. SAUNDERS:  But here, I guess that begs the

2   question, well, what is transformative use?

3          What is something that is truly transformative under

4   the copyright law?

5          And I think, again, a major distinction, if I may draw

6   to the court's attention, in Warhol was that the Second Circuit

7   found that the taking of Goldsmith's photographs was very

8   substantial, and most of the entire photograph was actually

9   used in the Warhol series, the print series.  And the Court

10  also found that in some instances, what Warhol did, actually,

11  magnified some of the aspects of the Goldsmith's photographs

12  rather than minimizing them.

13         So what the Second Circuit found is there was really a

14  very substantial taking of virtually the entire copyrighted

15  work of the photographer.  I think that is very different here

16  because, you know, what is transformation?  Well, the question

17  is, does the new work, the secondary work, add something new

18  with a further purpose, a different character, altering the

19  first with some new expression or meaning.

20         So the Second Circuit found in Warhol, no.  The

21  expression or meaning wasn't different enough for many reasons

22  that they went into, that we don't need to discuss here unless

23  you would like to.  But in the present case, you do have this

24  alteration, you do have this new meaning, you do have this new

25  purpose, and you do have a different audience.  All of this is

L9RsGRAc

1  relevant to alteration.

2          THE COURT:  I'm sorry.  What was the alteration?

3          MR. SAUNDERS:  I'm so sorry.  I didn't hear you.

4          THE COURT:  What was the alteration?

5          MR. SAUNDERS:  Oh, yes.  I was about to get to that.

6  Yes.

7          So the alteration was multifold.  First, only

8  17.5 percent of the song is used.  So when you cut -- when you

9  use such a small version -- amount rather -- of the original

10  copyrighted work, I mean, that by definition is an alteration.

11  You're not re-casting, as in Warhol.  You're not using

12  substantially the entire work for the secondary work.

13  17.5 percent, which is not disputed, it is an alteration in and

14  of itself.

15          But on top of it, your Honor, we have the audio

16  overlay of President Biden's voice on top of that, and then you

17  also have other audio and visual effects in the animation.  So

18  you have to look at the animation for what it is.  And I would

19  argue that it's clearly transformative under the case law, and

20  that Netflix is particularly instructive here.  Because in

21  Netflix, you have a situation where the song that was used in

22  the defendant's film was not obscured.  It was used, again, a

23  short portion, like here, but unobscured.  Nothing to obscure

24  it.

25          You know, you could hear the lyrics clearly, and yet

L9RsGRAc

```
1   the court found that that secondary use was transformative

2   because the purpose to, again, and the test, is to the

3   reasonable observer, that is the test.  The court found that

4   the reasonable observer would understand that this film had no

5   relation whatsoever to the original song.  It was a different

6   expression, different meaning, different purpose.

7              I think the same is true here, your Honor.

8              THE COURT:  But the court found that the song -- and

9   refresh my recollection.  What was the length of the portion of

10  the song that was used in terms of seconds?

11             It was something like five seconds or so?

12             MR. SAUNDERS:  I think it was about eight seconds,

13  roughly, give or take.

14             THE COURT:  Eight seconds.  It was maybe a fifth of

15  what the use was here of Electric Avenue.  It was much, much

16  smaller.

17             MR. SAUNDERS:  Right.

18             THE COURT:  Much, much smaller.  And the court found

19  that it was part of commentary, right?

20             MR. SAUNDERS:  That's correct, your Honor.  It was

21  found to be commentary.  But, again, that's not required under

22  the law to define --

23             THE COURT:  I know, but we are just trying to compare

24  cases.

25             MR. SAUNDERS:  Yes.
```

L9RsGRAc

| | |
|---|---|
| 1 | THE COURT:  So the court there found commentary.  Yes, |
| 2 | parody.  Not commentary, not necessary, but hard to see that |
| 3 | it's all that much on point. |
| 4 | If the court looked in <u>Netflix</u> at the fact that the |
| 5 | use was commentary on the work that was being used when it is |
| 6 | clear that this use in this case was not commentary. |
| 7 | MR. SAUNDERS:  Well, I think, two points. |
| 8 | First, in <u>Netflix</u>, the documentary film itself was |
| 9 | commentary.  I believe it's really unclear -- and I don't think |
| 10 | it may be the case -- that the documentary film from the |
| 11 | defendants was actually commenting on the song.  Eight seconds |
| 12 | of the song. |
| 13 | I think the song was used to create a certain -- to |
| 14 | create something that was commenting, in general, on burlesque |
| 15 | dancers.  But certainly the defendant wasn't really commenting |
| 16 | in any way on the song.  They were using it almost in a silly |
| 17 | way, because it was so absurd to have a children's song used in |
| 18 | an adult-themed film.  That is one point. |
| 19 | The second point, your Honor, is that in this case, |
| 20 | OK, so maybe it wasn't commentary, but it was certainly |
| 21 | criticism.  That animation was critical in raising points to |
| 22 | denigrate then candidate President Biden.  So I question the |
| 23 | distinction between commentary and criticism.  I think it's |
| 24 | very similar. |
| 25 | THE COURT:  But the music which was, as I say, a |

L9RsGRAc

 1  catchy tune, platinum, it's not conceivable, is it, that the

 2  music was commentary on anything.  It was a catchy tune.

 3         I mean, I just don't get that the music could possibly

 4  be considered to meet any of the fair use factors.  The music

 5  was taken.  It can't possibly be commentary for satire, the

 6  music.  Put aside the words.  And you correctly point out it's

 7  hard to hear the words, because there is other words going on

 8  at the same time.

 9         So we have music, catchy dance music, being taken and

10  used.  That sounds a lot like the district court cases in

11  California, where music is used for political commercials, and

12  the courts have said not fair use.

13         MR. SAUNDERS:  Well, let me address that if I may,

14  your Honor.

15         THE COURT:  Sure.

16         MR. SAUNDERS:  I guess the plaintiff cited a couple of

17  Central District of California cases for that very proposition.

18  But, again, the facts, I have to say, are very different.  For

19  example, in Henley, again, the court found, like the Second

20  Circuit in Warhol, that there the defendant borrowed very

21  heavily from the plaintiff's song.  In fact, what the defendant

22  did there, for their campaign video, was that they had actually

23  downloaded a complete version -- not edited, not a segment, not

24  a snippet -- but a complete version of the plaintiff's song.

25  Then they took the soundtrack and used the identical

L9RsGRAc

1    soundtrack.  Then on top of that, they had lyrics that had only

2    minimal changes.

3         So in that case, the court found, again, it is just

4    too much of a borrowing because you have basically taken the

5    plaintiff's entire song, both the musical composition and the

6    lyrics, so that crossed the line.  That crossed the line.  But

7    here, again -- so, in that case, it was plausible that one

8    might actually opt to acquire the defendant's work in lieu of

9    the plaintiffs.  Factors one and four, is it transformative.

10   Well, in Henley, definitely not.  It was too close.  It was the

11   entire song and musical composition.  Under factor four, well,

12   yeah, someone might say, yeah, I like that second version

13   better.  I'm going to buy that one or license that one instead

14   of the original Henley version.

15        But, again, your Honor, here, it is, I want to say, a

16   virtual impossibility, but it is highly unlikely that anyone

17   would opt to acquire the animation, even if they could, in lieu

18   of or instead of the plaintiff's song.  It doesn't jibe.  The

19   song is obscure.  It's still OK.  It is more seconds than was

20   used in some cases.  It's a lot less seconds than was used in

21   other cases in which fair use has been found.

22        But when you analyze that factor objectivity, and even

23   on this motion, just based on the allegations of the complaint,

24   it seems implausible that anyone would opt to purchase -- even,

25   again, as I said, even if they could -- the animation instead

L9RsGRAc

1    of the plaintiff's work.  That's a fundamental factor that goes

2    to the fair use analysis.

3            THE COURT:  By the way, do you know offhand how much

4    the plaintiff charges to license its work?

5            In other words, had the defendants simply said, hey,

6    that's a good song, catchy tune.  We'll simply license it for

7    use in our commercial.  Do you know what it would have cost?

8            It's not on the motion, I mean, because it's not on

9    the face of the complaint.  But do you have any idea what it

10   might cost to license the song?

11           I mean, it's not part of the motion papers.  It can't

12   be.  It's not in the complaint, so far as I know.

13           MR. SAUNDERS:  That's correct.  I don't believe it was

14   in the complaint.  The complaint certainly did allege that the

15   defendants was a campaign video.  I don't think the plaintiffs

16   made any allegations against what the license would have been,

17   and I cannot answer that question.  I don't know either.

18           THE COURT:  OK.  Thank you.

19           MR. SAUNDERS:  Again, your Honor, under the

20   well-settled law with respect to determining whether a

21   secondary work is transformative, you look to the specific

22   aspects of the secondary work, and not merely question, you

23   know, why something was used or necessarily, at least under the

24   first factor, whether too much of it was used or not.

25           But really, when it comes down to it under the uniform

L9RsGRAc

1   case law, the question really is, does it have a different

2   purpose, a new expression, and a different message.  And we

3   believe that a reasonable observer would say, yes, this

4   animation is so different from this song, the song is obviously

5   the musical entertainment and the animation is -- I don't know

6   if you want to call it absurd or comic -- a criticism of a

7   person, of a presidential candidate at the time.  So a

8   reasonable observer, I believe, certainly would understand and

9   perceive these differences and expression and purpose and

10  message from that of the original work.

11          In the Second Circuit's recent affirmance of the

12  Netflix case, there was a memorandum opinion, and the Second

13  Circuit, in affirming, noted that the film did not merely

14  rebroadcast the original work, the plaintiff's performance, but

15  combined it.  Again, in that case, with a commentary, which,

16  again, is nothing different than criticism.  Commentary,

17  criticism, to me, is somewhat synonymous and certainly

18  comparable.  So the same is true here, that the animation in

19  this case certainly did not rebroadcast the plaintiff's work,

20  but combined it with many other elements to give it a different

21  purpose, meaning, and expression.

22          I wanted to address plaintiff's cited two cases in

23  their supplemental brief for the proposition -- and I'm quoting

24  the brief -- "the unauthorized use of a popular song in a video

25  to promote a political candidate or denigrate a candidate's

L9RsGRAc

1  opponent is not transformative and is not fair use."  That's a

2  statement which I just quoted verbatim from page four of

3  plaintiff's supplemental brief.  But there is no such

4  hard-and-fast rule.  Absolutely not.

5          THE COURT:  I'm sorry.  There is no such?

6          MR. SAUNDERS:  Hard-and-fast rule, as plaintiffs cited

7  two case in support of that proposition, in support of that

8  supposed sweeping rule.

9          But in one case, another Central District of

10  California case, I believe, Browne v. McCain, in that case, the

11  court didn't even reach the issue, much less make any broad

12  ruling.  The court did not conduct a fair use analysis in that

13  case.

14          And in the second case, the second case they cited,

15  the proposition was Henley, which I just previously discussed,

16  so I won't reiterate the facts there, other than, again, to say

17  that in Henley, there was a large borrowing of the original

18  work.

19          So the bottom line here, your Honor, on that point is

20  there is no hard-and-fast, sweeping rule about using songs,

21  popular songs, in political videos.

22          THE COURT:  But that --

23          MR. SAUNDERS:  Each case has to be under certain

24  facts.

25          THE COURT:  I'm sorry.  But that may then lead to the

L9RsGRAc

1    conclusion that a motion to dismiss is not the ideal vehicle to

2    determine whether the use was fair use, to the extent that

3    there really is no hard-and-fast rule, that it depends upon a

4    close analysis of the facts of each case.  That suggests that

5    it would be on a motion for summary judgment rather than a

6    motion to dismiss.

7             MR. SAUNDERS:  Yes.  I wanted to address that too,

8    your Honor.

9             THE COURT:  You were just going to get to that.  You

10   were just going to get to that.

11            MR. SAUNDERS:  No.  It's actually at the end of my

12   outline.  I was saving it for last.  But I'd be certainly happy

13   to address it now.

14            THE COURT:  Well, it is sort of the end of your

15   argument, so by all means.

16            MR. SAUNDERS:  I thought I was finished with this.

17   Maybe I still will.

18            A couple of points here, your Honor.  First is, the

19   courts in this circuit, and particularly the Southern District,

20   have on many occasions actually decided the issue of fair use

21   under copyright law on the pleadings, whether a motion to

22   dismiss or judgment on the pleadings.  I mean, that is just a

23   fact.  They have.

24            And in this particular case, as a practical matter,

25   let's say, OK, we'll have some discovery.  What practically can

L9RsGRAc

1    the plaintiff discover that may aid the court in weighing the

2    four factors and making the fair use determination first on

3    factor one.  I mean, what discovery would elucidate anything

4    about the legal determination of whether the defendants' work

5    was transformative or not.  I raise that question as a serious

6    question because I really don't know.

7         Similarly, what discovery could the plaintiff take to

8    elucidate whether the markets for the plaintiffs and the

9    defendants for the song and the animation are distinct or

10   overlap?  My point is that I think, similar to Netflix and

11   other cases, you reach a point where the court is comfortable

12   saying, I can pair these two works and I can make this

13   determination based on the four corners of the complaint and a

14   comparison of the works.  I don't need anything else.

15        What else would I need to determine transformative

16   use, to determine certainly, in factor three, the amount of

17   use.  I mean, what discovery can you take there?  You could

18   have used more.  You could have used less.  And on the market

19   impact of what discovery could they take, as a factual matter,

20   unlike in all these other cases, including Netflix, in Netflix,

21   don't forget the defendant's film was for sale.  You could buy

22   it, you could rent it, and you could stream it.  You paid the

23   money.  It was a commercial use.

24        Here, we don't even have that.  If anything, the facts

25   are more extreme and sway further in defendants' direction here

L9RsGRAc

1   because the animation was not a commercial use.  It was, as far

2   as anyone knows, it was not for sale.  It was posted -- and

3   that's why I began with this, your Honor -- it was posted on

4   Twitter once, taken down, and never seen again.

5          So what my question is, as a really practical one,

6   what discovery could the plaintiffs take to the aid the court

7   in further making a determination on those three fair use

8   factors?

9          I really don't know.

10          THE COURT:  Well, discovery shouldn't take very long

11   in this case, but some inquiries might be the video that

12   surrounded the song and the lyrics, where did that video come

13   from?

14          Was that from a third party?

15          If so, was that paid for or not?

16          Is the song and the lyrics, the performance, licensed

17   to other people?

18          If so, for how much?

19          What reasonable basis is there to believe that the use

20   of the song in this case impacted the market for licensing the

21   song for other uses, including other campaign uses?

22          Has the song been licensed?

23          It's been out there for a long time.  Has it been

24   licensed?  If so, for how much?

25          What efforts were made by the producer of the video to

L9RsGRAc

1    get other music?

2              Why was this music chosen?

3              What was the knowledge of the person who took the

4    music?

5              Those are some of the questions that might be answered

6    in the course of discovery.  And, who knows, as I pointed out

7    at the outset, maybe there are other defenses other than fair

8    use which may be developed in the course of discovery.

9              MR. SAUNDERS:  Well, I certainly hear the court.  But

10   I would say -- and I understand -- but, again, under the fourth

11   factor, let's say the plaintiff did, in fact, license his song

12   to others for some type of commercial use.  Let's say we found

13   out how much it cost to pay a royalty to a third party to use

14   that song.  Even if we find that out, your Honor, I suggest and

15   believe that, under the fourth factor -- again, and I think

16   this is very clear from the Second Circuit -- that damage alone

17   to the market does not suffice under the fair use analysis.

18   There really must be usurping the market.  As if someone is

19   saying, I'm going to purchase the defendants' instead of the

20   plaintiff's.  I like it better and, clearly, it is a

21   subsequent.

22             Here, all I'm saying, your Honor, under any scenario,

23   no matter what the royalty might have been, no matter how many

24   times the song was licensed, to whom or for what purpose, I

25   still think that under the facts of this case, based on the

L9RsGRAc

1   allegations in the complaint, that this animation cannot -- as

2   a matter of law, common sense, and plausibility -- cannot usurp

3   the market of the plaintiff's original song.

4          That's my argument.

5          THE COURT:  Thank you.

6          MR. SAUNDERS:  Thank you, your Honor.

7          THE COURT:  Thank you.

8          Let me listen to the plaintiff.

9          MR. CAPLAN:  Your Honor, may I give my presentation

10  sitting here with this mic?

11         THE COURT:  Yes.  I was just told that we don't have a

12  dial-in for the public.  This is a public court proceeding.

13  Anyone can be here.  Anyone is welcome to be in the court.  I

14  assume that we didn't list a dial-in number precisely because

15  this is a public court proceeding.  Anyone could walk into the

16  courtroom and listen.

17         MR. SAUNDERS:  There was a dial-in number, your Honor.

18         THE COURT:  There was?

19         MR. SAUNDERS:  Yes.  There was in your order, your

20  Honor.  There was a dial-in, yes.  I don't know if it's not

21  working.

22         THE COURT:  For some reason, it is not working.

23         MR. CAPLAN:  Here is a copy of the order, I believe.

24         MR. SAUNDERS:  There is a public dial-in option in

25  your summary order, in the minute entry.

L9RsGRAc

1          THE COURT:  Well, we try.  We try.

2          (Pause)

3          All right.  I understand that the telephone dial-in

4     has now been connected.  The conference has been going on in

5     open court.  There was a delay in setting up the telephone

6     court conference, but the conference has been proceeding in

7     open court.  We have been keeping a transcript.  The transcript

8     is available from the court reporter.

9          I have listened to argument from defense counsel in

10    support of the motion to dismiss, and now I'll turn to

11    plaintiff's counsel for a response.

12          MR. CAPLAN:  Thank you, your Honor.

13          It is respectfully submitted that each of the four

14    fair use factors, when applied to the facts alleged in the

15    complaint, favor the plaintiffs.

16          Turning to the first fair use factor analysis, the

17    purpose and character of the use.  Defendants argue that the

18    anti-Biden video is transformative as a matter of law.  That is

19    simply not the case.

20          The anti-Biden video is not a documentary.  It is not

21    a commentary on plaintiffs' original work.  The video is not a

22    parody.  It is simply a political advertisement.  We submit

23    that the video is a commercial and is not transformative as a

24    matter of law.  Defendants arbitrarily picked *Electric Avenue*

25    to synchronize to the animation in the anti-Biden video, which

L9RsGRAc

1    means it is not commentary, criticism, or a parody.

2         As defendants readily admit at page eight of their

3    opening brief, the video is not related to the original song or

4    the message of the video in any capacity.  Under defendants'

5    theory of fair use, any politicians can use any recording in

6    any political advertisement without a license from the original

7    copyright owners of the sound recording or the underlying

8    composition and body such recording without compensation to

9    such copyright owners.  That is simply not the law.

10        THE COURT:  Hold on.  Doesn't the song and the lyrics

11   come over in a different way when it is transposed with the

12   additional verbiage and the additional video in the same that

13   way that some of the art in Cariou comes over in a different

14   way, even though the art, the Cariou art, is still being used?

15   Admittedly the Court of Appeals has told us Cariou was a high

16   point in transformative use, but it surely wasn't commentary on

17   Cariou's work.

18        Do you follow?

19        MR. CAPLAN:  I think, your Honor, that visual art and

20   a modification of a piece of visual art is different from

21   taking a musical composition and throwing it into a video that

22   has nothing to do with the subject matter of the original work.

23        So I would say that this case is more akin to TCA

24   Television Corp. v. McCollum, where -- and I think that case is

25   instructive -- and in this case, the defendant incorporated

L9RsGRAc

portions of the famous comedy routine, *Who's On First*, in an

unrelated play.  And in rejecting the fair use defense, the

Second Circuit noted, "Even if the play's purpose in character

were completely different from the Brazilian humor originally

animating *Who's On First*, that by itself does not determine

that defendants' use of the routine in the play was

transformative of the original work."

I would suggest that if you can take any song out

there out of the million songs that preexist today and plop it

into a video for an anti-political message against a particular

candidate, and there is no relationship between the particular

song and the video usage, that that's not transformative.  And

if it was transformative, it would be opening up the floodgates

to the usurpation of people's creative energies in the music

industry and would be totally unfair.

THE COURT:  Could I ask you the same question I asked

your colleague before, which is, I realize that it goes beyond

the papers and beyond a motion to dismiss, but you argue that a

motion to dismiss is inappropriate because there should be a

factual record in order to be able to determine fair use.

One of the factors is, in effect, on the market.  And

I realize it is not part of the papers, but do you know, is

this song licensed?  And if so, do you know what the licensing

fee is to be able to use this in an ad, for example?

MR. CAPLAN:  So there are two types of licenses

L9RsGRAc

involved in the case.  One is with respect to the sound

recording and one is with respect to the underlying

composition.

My recollection, from months and months ago and I

heard something about this, and I don't want to be quoted on

it, but my recollection was that in a high point, some

six-digit number was the licensing fee for each component part,

for the sound recording and for the composition.  There might

have been lower ones as well, and there is a history of

licensing, and during discovery, that would all come out.

I would also -- since we're talking about the effect

on the market, I would suggest that if you go onto YouTube

right now, the video is still there.  Even though the -- and

this is outside the pleadings, obviously, but we obviously have

ventured a bit outside the pleadings in some of these

discussions.  Who knows, without experts, etc., what the impact

on the market for the song is when having a video that has the

song in it is readily available to be.

THE COURT:  Public.

MR. CAPLAN:  Yes, to be watched.

Since nowadays people aren't purchasing music but they

are using it through Spotify, etc., then somebody who watches

it on YouTube might not purchase a song through Spotify because

they have streamed it on the video.  So there is many open

questions dealing with the effect on the marketplace which, in

L9RsGRAc

1    my mind, are totally inappropriate for a motion to dismiss.

2         But that's separate and apart from the question of

3    transformative in nature, and I don't believe that under Cariou

4    or any case that I've seen, there is a strong argument that the

5    work is transformative simply because you plop it and put it

6    into a new animation that has nothing to do with the song.

7    We're not talking about a song like *I've Been Working on the*

8    *Railroad*.  We're talking about *Electric Avenue* here.  So maybe

9    if Mr. Biden was, you know, doing something different in the

10   video and it was *I've Been Working on the Railroad*, there would

11   be a different argument.  But that is not what happened here.

12   It was an arbitrary and capricious decision to throw in

13   *Electric Avenue*, and it has nothing to do with the animation or

14   the subject matter.

15        I think both the Jackson Browne case and the Henley

16   case are instructive, and those cases involve political

17   advertising.  And in the Browne case, as the court knows from

18   our briefs and I'm sure having read the case, *Running On Empty*

19   was used without permission by the Republican National

20   Committee.  And the court noted that it wouldn't entertain,

21   even entertain the defendants' claim for fair use until after

22   the parties had a full opportunity to conduct discovery.

23        And in a later opinion in the same case, the court

24   went beyond that and said that *Running On Empty*, as used in the

25   ad at issue, was not transformative.  And we would suggest that

L9RsGRAc

1   the same rationale from the <u>Jackson Browne</u> case applies to the

2   case at bar.

3           In the <u>Henley</u> case -- and I'm going to try to do this

4   quickly, your Honor, because you have given us a lot of time --

5   but there was, again, two songs by Don Henley of The Eagles,

6   and the court held that the uses were not transformative.  I

7   don't see a distinction factually between the <u>Henley</u> and <u>Browne</u>

8   cases because they didn't turn on the amount of taking.  They

9   turned on plopping a song into a video that was an

10  anti-campaign video against a particular candidate, and they

11  basically both assessed it to be the equivalent of an

12  advertisement.

13          And in the <u>Henley</u> case, they found that there was harm

14  to Henley's licensing market.  We would suggest that the same

15  analysis should apply here.

16          THE COURT:  But in <u>Henley</u>, the ad included a pitch for

17  political contributions, didn't it?

18          MR. CAPLAN:  It did.  There is no doubt about that.  I

19  don't think that was determinative of the court's decision.

20          I read it over a couple of times because I knew the

21  court was going to ask that question.  I think that when you're

22  doing a political ad in favor of a particular candidate, making

23  a contribution goes hand in hand in the popularity of that

24  candidate, so that I don't have to be asking for a contribution

25  in the ad for it to still be commercial in nature.

L9RsGRAc

1          It is respectfully submitted that the defendants can't

2     overcome the Second Circuit's recent decision in the Warhol II

3     case.  Their principal argument is that the animation as

4     something new to the plaintiffs' composition with a new

5     aesthetic, a new expression, or different character and, there,

6     by definition, it is transformative.

7          However, the Second Circuit in Warhol specifically

8     found that many derivative works that add something knew to the

9     source would not qualify as fair use.  And they specifically,

10    in quotes, said it does not follow that any secondary work that

11    as a new aesthetic or new expression to its source material is

12    necessarily transformative.

13         I think that language is, if you juxtapose that

14    against Cariou, you would think it has eroded Cariou to some

15    level.

16         THE COURT:  Well, it certainly attempted to throw some

17    cold water on Cariou.  It went out of its way to emphasize that

18    Cariou was a high watermark and has been criticized in other

19    places.  But the court was "bound" by Cariou and it certainly

20    wasn't a full-throated endorsement of Cariou.

21         MR. CAPLAN:  The defendants suggested that the video

22    was a satire, not a parody.  However, the Supreme Court in

23    Campbell v. Acuff-Rose has explained that if the work is a

24    satire and not a parody, the secondary user must demonstrate a

25    justification for the use.  Defendants have not and cannot

L9RsGRAc

1    demonstrate such a justification.  It is also premature on a

2    motion to dismiss.

3        OK.  In conjunction with the first fair use factor,

4    defendants have cited and relied upon a number of cases which

5    are factually distinguishable from the case at bar.  I'll

6    briefly talk about those four cases.

7        Netflix, where eight seconds of a copyrighted song was

8    used in a documentary film about a burlesque performer and was

9    deemed a fair use.  It was a documentary film.  We're not

10   talking about a documentary film here.  And the eight-second

11   use in the routine of the burlesque performer happened also to

12   be a parody.  So there is two significant factual distinctions.

13   One is it was a documentary with critique/criticism or social

14   comment, and two, it was arguably a parody that was actually

15   being filmed.  Although I think that is less important than the

16   fact that it was a documentary.

17       THE COURT:  I didn't think the court relied on parody.

18       MR. CAPLAN:  That's why I'm saying it was

19   significantly less important.

20       With respect to the Estate of Smith, where 35 seconds

21   of a spoken word recording was used in a hip hop album and

22   deemed fair use.  There, the court specifically determined that

23   the new work sent a counter message relating to the original

24   work.  OK.  So I think that is factually distinguishable, and

25   this was a summary judgment decision after discovery.

L9RsGRAc

1          In the John Lennon v. Premise Media case, the

2    15-second clip of John Lennon's *Imagine* in a movie for purposes

3    of criticism and commentary was deemed transformative.  That

4    movie, that film at issue in that movie, was a documentary

5    about religion in universities.  And the context of the using

6    *Imagine* related to a social critique in commentary, something

7    we don't have here.

8          The Nader case also relied upon defendants was in a

9    case involving a parody of a previous existing line of

10   commercials for a Mastercard where the catch phrase "priceless"

11   was used.  No music was involved in that case.  And I would

12   suggest it was a weak copyright claim in the first instance

13   because we are talking about simply the string of commercials

14   using "priceless" as its tagline.  And I think that case is

15   significantly factually different from the case that we have

16   here.

17         Quickly turning to the second fair use factor for a

18   moment, the nature of the copyrighted work.  The composition

19   and sound recording at issue are clearly creative expressions

20   entitled to broad protection consistent with the core

21   protective purposes of the copyright act.  Defendants have

22   skimmed over this issue and presented no authority to the

23   contrary.

24         Regarding the third fair use factor, the amount and

25   substantiality of the portion used.  Defendants have offered no

L9RsGRAc

1   explanation or justification for choosing plaintiffs' song to

2   serve as a soundtrack for the anti-Biden video that they admit

3   is unrelated to the original.  The video is 55 seconds long.

4   40 seconds of *Electric Avenue* was incorporated into the video,

5   including the hook.  The hook, what you walk away from singing

6   to yourself after you watch the video.  The song is immediately

7   recognizable in the video by anybody who knows *Electric Avenue*.

8       OK.  I suggest it is plausible that somebody would go

9   and listen to the song by just listening to the video.  Because

10  they might laugh at the same time by seeing the video, but they

11  would hear the song and that could detract from their

12  purchasing the song.

13      The fact that only 17 percent of the song was used, in

14  our opinion, is irrelevant because if you do a qualitative

15  analysis and a quantitative analysis, *Electric Avenue* serves as

16  a substantial component of the anti-Biden video.

17      With respect to the fourth fair use factor, I think it

18  is clear that, at this juncture, there would only be, at best,

19  guesswork by the defendants to suggest that there has been no

20  harm to the market.  In <u>Warhol II</u>, it is important that the

21  court accepted the lower court's conclusion after discovery

22  that the parties' respective work occupied the state markets,

23  at least as far as direct sales are concerned, but nonetheless,

24  found the fourth factor waived in the copyright owners favor.

25      First, it recognized that burden of establishing a

L9RsGRAc

1    harm --

2            THE COURT:  I'm familiar with Warhol I and Warhol II.

3            MR. CAPLAN:  OK.  I won't go on further with that

4    then, your Honor.

5            Defendants here have come forward with no evidence

6    whatsoever with regard to market harm other than speculation

7    and conjecture by attorneys.  OK.  There is no experts.  And

8    I would say that it's premature to make a ruling against the

9    plaintiff with respect to market harm.

10           We believe, consistent with the findings of the court

11   in the Don Henley case, that the use of plaintiffs' copyrighted

12   songs in the anti-Biden video have caused recognizable and

13   cognizable harm to the plaintiffs' licensing market.

14           For all of the foregoing reasons, we respectfully

15   submit that defendants' motion to dismiss should be denied.

16   And we also would like to suggest to the court that under the

17   undisputed facts of this case, we believe the court could find

18   that the work, the defendants' work, the Biden video, is not

19   transformative as a matter of law, and the court could

20   determine that the defendants' use of Electric Avenue is not a

21   fair use as a matter of law.

22           Thank you for your time.

23           THE COURT:  That's not the relief that you seek in

24   your papers.

25           MR. CAPLAN:  No.  We have simply opposed the motion in

L9RsGRAc

1    our papers.  Yes, your Honor.

2              THE COURT:  Right, so...

3              MR. CAPLAN:  But I believe the court has inherent

4    authority to make such a decision.  If I'm wrong, then you

5    don't have to.

6              Thank you for hearing me out.

7              THE COURT:  OK.  Thank you.

8              I'll take the papers under submission.  Thank you all.

9    I appreciated your papers.  I appreciated the subsequent

10   briefing, and I appreciated the arguments.

11             Thank you all.  Thank you for coming in and arguing

12   under these difficult conditions with masks.  It's not easy to

13   talk.  It's not easy to hear with all of the masks.

14             So thank you all.

15             MR. CAPLAN:  I want to say thank you, your Honor, for

16   having us in.  I'm pleased to be back in court after 20 months.

17             THE COURT:  Even under strange circumstances.

18             MR. CAPLAN:  Yes, indeed.  Even under these

19   circumstances, it's great to be back.

20             THE COURT:  Thank you all.

21             MR. CAPLAN:  Thank you, your Honor.

22             MR. SAUNDERS:  Thank you, your Honor.

23             (Adjourned)

24

25